# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### OCALA DIVISION

**OSCAR CONTRERAS AGUILAR,**

      **Plaintiff,**

    **v.**　　　　　　　　　　　　　　　　**Case No.:  5:25-cv-00396-MSS-PRL**

**DONALD J. TRUMP, ATTORNEY GENERAL OF THE UNITED STATES, WILLIAM K. MARSHALL, WARDEN E. K. CARLTON, and SHANNON D. WITHERS,**

      **Defendants,**

                    /

### ORDER

**THIS CAUSE** comes before the Court for consideration of Plaintiff's Emergency Motion for Protective Order, (Doc. 64), Motion to Reopen Case and Motion for a Hearing on the Second Motion for Temporary Restraining Order, (Doc. 65), non-party Darnell Nash's Emergency Motion for Injunction Order Protection of Prisoner Witnesses (Docs. 70, 72),[1] and the Defendants' Omnibus Opposition to Plaintiff's Emergency Motion for a Protective Order and Darnell Nash's Emergency Motion for Injunction (Doc. 76), Plaintiff's Status Report and Special Notice to the Court (Doc. 77), Nash's Emergency Motion for Protective Order (Doc. 81),  Nash's Notice Regarding the Retaliatory Denial of Ms. Nash's Earned Federal Time Credits

---

[1] Ms. Nash filed two copies of this motion–a hand-written version and a photocopied version. *Compare* Doc. 70 and Doc. 72. There are a few minor differences with the attached exhibits that the Court will take into consideration when ruling on the motions.

(Doc. 82), and Plaintiff's Reply to Defendants' Response in Opposition to Plaintiff's Emergency Motion for a Protective Order (Doc. 84). For the reasons set forth herein, the Court Orders that the Motions are DENIED except those that are referred to the Kingdom action.

## BACKGROUND

On June 20, 2025, Plaintiff filed a Complaint asserting various constitutional claims related to the implementation and enforcement of Executive Order ("E.O") 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, and sought preliminary and permanent injunctive relief. (Doc. 1). Plaintiff also filed a separate "Emergency Motion for a Temporary Restraining Order and Preliminary Injunction." (Doc. 4). Plaintiff subsequently amended her complaint. (Doc. 11).

On October 3, 2025, the Court issued a temporary restraining order and a preliminary injunction. (Doc. 31). The Court ordered that "Pat down searches and strip searches of Plaintiff are to be conducted by female guards only, until the Court conducts a hearing on the matter and makes a final determination." *Id*. at 8. By separate order issued on the same date, the Court granted the United States' motion to stay the case during the lapse in government appropriations, specifically stating that "[t]he Temporary Restraining Order and Preliminary Injunction entered on October 3, 2025 (Doc. 31) shall remain in place while the government shutdown is in effect." (Doc. 32).

2

On February 2, 2026, the Court held a hearing on Plaintiff's motion for injunctive relief. Plaintiff and Inmates Darnell Nash, James Radford, Franklin Mackensi Robinson, Ronald Fourhorns, and Jimmy Ramos testified. *See* Doc. 60. At the conclusion of the hearing, the Court dissolved the search exemption for Plaintiff and stayed the case pending resolution in the class action, *Kingdom v. Trump*, Case No. 1:15-cv-691 (D.D.C.). (Doc. 61). The Court, however, granted Plaintiff "leave to file any new demand for injunctive relief should there be any new circumstances that arise or any retaliation due to Plaintiff's initiation or pursuit of relief in this action." *Id*.

On March 16, 2026, Plaintiff moved to reopen this case and for an emergency protective order against retaliation. (Docs. 64, 65).[2] Plaintiff alleges a range of retaliatory actions purportedly perpetrated by USP Coleman Staff against the testifying inmate witnesses, including a strip search of Plaintiff upon return from the hearing to the facility, confiscation of Plaintiff's papers, an additional pat search and longer cell search during a "mass shakedown," the cancellation of "the most watched TV channels," planting weapons on Inmate Ronald Fourhorns, and an alleged assault on Inmate Darnell Nash. (Doc. 64).

On March 23, 2026, Inmate Darnell Nash separately filed an "Emergency Motion for Injunction Order Protection for Prisoner Witnesses." (Doc. 70). Nash alleges removal from preferential housing, placement in segregation, denial of crisis

---

[2] The Court denied Plaintiff's second motion for a temporary restraining order and preliminary injunction, (Doc. 66), seeking to enjoin BOP's new program statement as duplicative of *Kingdom v. Trump*. (Doc. 67).

counseling, subjection to physical and sexual assault by inmates and staff, and denial of good time credits. *Id*. at 3, 5.

## LEGAL STANDARD

To obtain a temporary restraining order or preliminary injunction, the movant must establish: "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225-26 (11th Cir. 2005). Immediate injunctive relief is an "extraordinary and drastic remedy, and [the movant] bears the burden of persuasion to clearly establish all four of these prerequisites." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016).

The appropriate remedies with respect to prison conditions are set forth in 18 U.S.C. § 3626:

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

§ 3626(a)(1)(A).

4

## DISCUSSION

### A. Court's Inherent Power to Protect Witnesses

This Court possesses inherent powers that are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious dispositions of cases." *Dietz v. Bouldin*, 579 U.S. 40, 45 (2016). "[D]eeply rooted in the common law tradition is the power of any court to 'manage its affairs [which] necessarily includes the authority to impose reasonable and appropriate sanctions upon errant lawyers practicing before it.'" *Malautea v. Suzuki Motor Co., Ltd.*, 987 F.2d 1536, 1545 (11th Cir. 1993) (citation omitted). "Courts' inherent power also extends to parties to the litigation." *Id.* (citation omitted). "[D]istrict courts have broad discretion to determine whether to impose sanctions and the nature or amount of those sanctions." *Peer v. Lewis*, 606 F.3d 1306, 1316 (11th Cir. 2010). "Sanctions under the Court's inherent authority may include monetary penalties, adverse inferences, and the striking of claims or defenses." *Spring Sols., Inc. v. Fils-Amie*, 83 F. Supp. 3d 1290, 1295 (S.D. Fla. 2015) (citations omitted). Of course, this list is not exhaustive.

The court's inherent authority "is both broader and narrower than other means of imposing sanctions." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991). While other sanction mechanisms only reach certain individuals or conduct, "the inherent power extends to a full range of litigation abuses" and "must continue to exist to fill in the interstices." *Id*.

Notwithstanding the foregoing, the court must exercise its inherent authority with "restraint and discretion." *Id*. at 44. To justify its use, "the party moving for sanctions must show *subjective* bad faith." *Hyde v. Irish*, 962 F.3d 1306, 1310 (11th Cir. 2020) (emphasis in original). "This standard can be met either (1) with direct evidence of ... subjective bad faith or (2) with evidence of conduct so egregious that it could only be committed in bad faith." *Id*. (internal quotation marks and citation omitted). "Evidence of recklessness alone won't suffice." *Id*. The key to unlocking a court's inherent power is a finding of bad faith. *See In re Mroz,* 65 F.3d 1567, 1575 (11th Cir. 1995).

Here, a showing of retaliation or threats of retaliation would be akin to witness tampering. *See, e.g.*, 18 U.S.C. § 1512 (defining witness tampering as "knowingly uses intimidation or physical force, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person with intent to influence, delay, or prevent the testimony of any person in an official proceeding...."). Witness tampering is sanctionable under this Court's inherent authority. *See, e.g., Riley v. New York*, No. 10-cv-2513 (MKB), 2015 WL 541346, at *12 (E.D.N.Y. Feb. 10, 2015) (finding witness tampering to be sanctionable conduct under the court's inherent powers); *United States v. Vasilakos*, 508 F.3d 401, 411 (6th Cir. 2007) ("A federal court's authority to protect the integrity of its proceedings encompasses the authority to take reasonable actions to avoid intimidation or coercion of witnesses."); *Ty Inc. v. Softbelly's Inc.*, 517 F.3d 494, 498 (7th Cir. 2008) ("Trying improperly to

influence a witness is fraud on the court and on the opposing party ....”); *Green v. Indep. Pilots Ass'n*, No. 18-5296, 2018 WL 9651540, at *3 (6th Cir. Oct. 4, 2018).[3]

### B. Retaliation Against Plaintiff

#### 1. Visual Search

Plaintiff claims that upon being returned to the prison following the hearing, she was subjected to a strip search in front of multiple male guards. (Doc. 64 at 1). During the search, she claims the guards made derogatory comments. *Id*. She claims that she was the only prisoner that participated in the hearing who was subjected to observation by multiple male guards during the search.

Although prisoners have no Fourth Amendment right to be free from strip searches, *Bell v. Wolfish*, 441 U.S. 520, 557–59 (1979), the Eighth Amendment prohibits the "unnecessary and wanton infliction of pain," *Wilson v. Seiter*, 501 U.S. 294, 296–98, (1991) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976)). Thus, if the visual search of Plaintiff was devoid of penological merit and imposed simply to inflict pain, the federal courts should intervene. *See Turner v. Safley*, 482 U.S. 78, 83–85 (1987).

Per Bureau of Prisons ("BOP") policy, when inmates reenter an institution, staff are required to perform a visual search. *See* Doc. 76-1 at 1; *see also Powell v. Barrett*, 541

---

[3] The Court recognizes that other authority may temper the court's authority as it relates to the exercise of the Defendant BOP's authority to manage, control and protect incarcerated individuals and Corrections Officers. *See Bell v. Wolfish*, 441 U.S. 520, 547 (1979) ("Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."). Because the Court determines not to exercise its authority here, it need not delve into those issues

F.3d 1298, 1310, 1314 (11th Cir. 2008) (en banc) (upholding strip searches as part of a jail's booking process to prevent the smuggling of contraband). Matthew Barber, Acting Associate Warden and United States Penitentiary II ("USP II"), Coleman, Florida, assigned Unit Manager Jamanca, a supervisory staff member, to perform Plaintiff's visual search. *Id.* Barber declares that Jamanca performed the search alone, outside of the presence of other correctional officers. *Id.* Here, the compliance with BOP policy requiring visual searches of inmates upon their return to the institution creates a "presumption of reasonableness" that attaches to prison security regulations. *See Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995); s*ee also, Turner*, 482 U.S. at 83–85; *Bell*, 441 U.S. at 546–47.

Plaintiff cannot show that being subjected to a visual search upon her return to USP II was in retaliation for her participation in the February 2, 2026, hearing. While Plaintiff's contested claim that this search occurred in view of multiple male guards who made derogatory comments is concerning, if true, it fails to rise to a level that would trigger the Court's inherent authority to intervene into the purview of the BOP's management of its facilities.

### 2. Confiscation of Legal Folder

Plaintiff claims that upon her return to USP II that BOP officials "immediately confiscated Plaintiff's legal folder with all of her legal documents related to the instant case in it." (Doc. 64 at 1). Plaintiff claims the officials held the folder "for days" and only returned it after Plaintiff threatened to file a motion with the Court. *Id.* at 1–2.

Plaintiff claims that there "were numerous documents missing" when the folder was returned. *Id*. at 2.

Barber declares that upon her return to USP II, Plaintiff sought to keep copies of the female only search exemption cards that were no longer in effect. (Doc. 76-1 at 2). Staff in the Receiving and Discharge ("R&D") Unit took Plaintiff's papers to search for copies of the search exemption cards. *Id*. R&D staff began the search in front of Plaintiff, who voluntarily left the R&D Unit before the search was completed. *Id*. Plaintiff returned the next day to retrieve her paperwork, except for the search exemption cards. *Id*.

Plaintiff submitted a declaration in response to Barber's declaration. (Doc. 84-1 at 2–9). Plaintiff states that on January 30, 2026, when she was picked up the U.S. Marshal Service to attend the February 2 hearing, the officers at R&D took her special identification card and she did not have it in her folder when she returned to the prison on February 13, 2026. *Id*. at 4. Plaintiff's legal folder contained approximately 350 pages when she returned to the prison. *Id*. at 5. Plaintiff states that all inmates are "locked in holding tanks" while they are in R&D and are not free to walk around and leave. *Id*. Plaintiff made "repeated" demands for the return of her legal folder, including two emails to the Warden. *See id*.; Doc. 84-5 at 2; Doc. 84-6 at 2. "About 4-5 days later" her folder was returned with around 80 pages missing. (Doc. 84-1 at 6). Plaintiff claims the following documents are missing: (1) a legal letter from a staff member of the Office of the Mayor in Santa Fe, New Mexico to US Senator Jon Ossoff; (2) a copy of the Court's Oct. 3, 2025, Order (Doc. 31); (3) Plaintiff's

handwritten notes of the defendant's witnesses' testimony at the February 2 hearing; (4) all copies of emails she sent to Warden at USP II; (5) all copies of Barber's declarations in this case; and (6) all declarations of inmate witnesses regarding unavailability of administrative remedies. *Id.*

Plaintiff's items were searched upon her return to USP II, presumably to prevent contraband from being introduced into the prison. Plaintiff acknowledges that most of her materials were returned, however certain materials directly related to the hearing were allegedly confiscated and have not been returned to her. A seizure of Plaintiff's legal papers in retaliation for her testifying at the February 2 hearing would violate Plaintiff's First Amendment rights and may rise to a level where the Court should intervene. However, as Plaintiff contends, we do not have any statements from the R&D staff regarding the actions they undertook, if any.

Accordingly, the BOP shall provide a declaration from the R&D staff member or members responsible for searching Plaintiff's legal folder. The BOP is also directed to show cause as to why Plaintiff's materials were confiscated, whether they have the materials in the possession, and if so, why they should not be returned to Plaintiff. Alternatively, the BOP may advise that any materials that were reviewed either were not seized or have since been returned.

### 3. Pat and Cell Searches

"A detention facility is a unique place fraught with serious security dangers," including the "[s]muggling of money, drugs, weapons, and other contraband," it is within a corrections officer's discretionary authority to conduct searches of inmate

10

living areas to maintain prison security. *Balbin v. Johnson*, No. 22-11182, 2025 WL 883064, at *2 (11th Cir. Mar. 19, 2025) quoting *Bell*, 441 U.S. at 557, 559. Corrections officers need "[u]nfettered access" to prison cells "if drugs and contraband are to be ferreted out and sanitary surroundings are to be maintained." *Hudson v. Palmer*, 468 U.S. 517, 527 (1984).

Plaintiff claims that Officer Thompson "targeted Plaintiff within days of Plaintiff returning to [USP II], by pat searching her and then going in her cell, covering the door window, and searching Plaintiff cell for about 30 minutes." (Doc. 64 at 2). Thompson allegedly searched other cells for 2-3 minutes. *Id*.

Barber declared that each individual staff member assigned to a housing unit on Day Watch and Evening Watch must search at least five cells per shift. (Doc. 76-1 at 2). All cells must be routinely and randomly searched, and it is not uncommon to have multiple searches of a cell per month. *Id*. There are 64 cells in K-1 Unit, and K-1 Unit has frequent contraband violations. *Id*. From December 30, 2025, through March 30, 2026, Plaintiff's cell was searched five times: January 4, January 19, February 15, February 22, and February 24. *See id*. at 5. Officer Thompson only performed the February 24 search. *Id*. at 2.

Plaintiff has failed to establish that she was subjected to excessive or unnecessary searches because of this case or her testimony at the February 2 hearing.

### 4. "Shake-down" in K1 Unit

Plaintiff claims that within days of the February 2 hearing, "BOP officials

11

conducted a massive shake-down in K1 Unit" to retaliate against the entire unit. (Doc. 64 at 4). Barber denies that there has been a "mass shakedown of the K-1 unit since February 2, 2026." (Doc. 76-1 at 2). Even if the Court were to accept Plaintiff's claim that a mass shakedown occurred in the K-1 Unit after Plaintiff and other witnesses testified at the February 2 hearing, Plaintiff's own allegations offer a plausible explanation for the broad inspection. Specifically, Plaintiff's claims that the "prison is flooded with many drugs" and that "85% of the inmates here carry shanks (knives)." *see* Doc. 64 at 5.

### 5. Removal of Television Channels

Plaintiff claims that "within days" of the hearing, "BOP officials cancelled and shutdown numerous T.V. channels (the most watched TV channels)" and allegedly blamed it on Plaintiff and the February 2 witnesses. (Doc. 64 at 4). Barber denies that there has been "any change to the television channel programming at the facility since February 2, 2026." (Doc. 76-1 at 2). The Court finds that any alleged removal of television channels is not sufficiently adverse to Plaintiff to constitute retaliation. It is within the BOP's sound discretion to provide or withhold entertainment and leisure activities to incarcerated individuals, and television channel programming falls within that discretion.

### 6. Refusal to Provide Administrative Remedy Forms

Plaintiff claims that "BOP officials continue to refuse to issue administrative remedy forms." (Doc. 64 at 4). Specifically, she claims that during the afternoon of March 10, 2026, Plaintiff requested forms from Counselor Haughton. *Id*. Haughton

"refused to give Plaintiff the forms and walked away." *Id*. Plaintiff then emailed the Warden "alerting him that staff are still refusing to issue administrative remedy forms." *Id*.

On March 10, 2026, the inmates in the K-1 Unit were confined to their cells, so Haughton "performed a unit round on that day." (Doc. 76-3 at 1). Haughton denies that Plaintiff "ma[d]e a request, written or otherwise, for a grievance form." *Id*. He further denies that he has received any requests for a grievance form from Plaintiff at "Open House" or at any other time since February 2, 2026. *Id*. at 1–2. Haughton states that he has provided and accepted over 50 BP-8 grievance forms, covering 38 separate issues for the inmates in K-1 and K-2 Units since February 2, 2026. *Id*. at 2.

Plaintiff has failed to provide evidence, beyond this single instance, that Haughton is retaliating against her by refusing to provide grievance forms because she testified at the February 2, 2026, hearing. It is plain from the instant pleadings that Plaintiff has been afforded access to the Court in any event, such that any such allegation has not deterred Plaintiff from pursuing her rights.  She is not authorized to assert claims on behalf of others. *See* 28 U.S.C. § 1654. The right to appear pro se does not extend to the representation of the interests of others. See *Timpson v. Sampson*, 518 F.3d 870, 873 (11th Cir. 2008).

### C. Retaliation Against Inmate Fourhorns

Plaintiff claims that within days of Inmate Fourhorns's testimony at the February 2, 2026, hearing that Officer Thompson "planted" a shank on Fourhorns. (Doc. 64 at 2). Plaintiff claims that Fourhorns "vehemently denies that the shank was

his." *Id.* As a result, Fourhorns was placed in solitary confinement in the Special Housing Unit ("SHU"). *Id.*

First, Plaintiff lacks standing to pursue a remedy for another individual. Although individual parties in federal court generally "may plead and conduct their own cases personally or by counsel," *see* 28 U.S.C. § 1654, the right to appear *pro se* does not extend to the representation of the interests of others. *See Timpson v. Sampson*, 518 F.3d 870, 873 (11th Cir. 2008). Mr. Fourhorns has not sought relief from the Court, nor has he presented any statement of the type that would support Plaintiff's allegation.

Moreover, in response to Plaintiff's claims, Defendants have submitted, under seal, copies of Inmate Fourhorns's disciplinary history,[4] Incident Report 4253271, and the Discipline Hearing Officer ("DHO") Report. On February 6, 2026, Officer Petrie conducted the pat down search of Inmate Fourhorns and discovered a homemade weapon concealed in the inmate's right ankle area. According to the Defendants, a disciplinary hearing was held, and Inmate Fourhorns admitted the charge but declined to make a statement. *See* Doc. 74-2 at 1–4. The DHO determined that Inmate Fourhorns committed the prohibited act of possession of a weapon. *Id.* If this is true, the claim of Mr. Fourhorns would fail.

---

[4] The disciplinary records include incident reports and disciplinary findings that Inmate Fourhorns has been convicted multiple times with possessing a weapon during his incarceration. *See* Doc. 74-1.

"[A]n inmate cannot state a claim of retaliation for a disciplinary charge involving a prison rule infraction when the inmate was found guilty of the actual behavior underlying the charge after being afforded adequate due process." *O'Bryant*, 637 F.3d at 1215. If Inmate Fourhorns admitted to and was found guilty of possessing a weapon, Plaintiff's claim of retaliation against Inmate Fourhorns would necessarily fail.[5]

### D. Retaliation Against Inmate Mckensie

Plaintiff claims that on March 26, 2026, Inmate Mckensie, another witness at the February 2 hearing, was targeted by Officer Thompson, who "planted a shank (home-made knife) and drugs" in Inmate Mckensie's cell. (Doc. 77 at 1). Plaintiff claims that Inmate Mckensie "vehemently denies that he had a shank in his cell and will testify to it." *Id*. Plaintiff states that "virtually every single one of Plaintiff's witnesses have been targeted and retaliated against." *Id*.

Plaintiff lacks standing to pursue a remedy for Inmate Mckensie. *See Timpson*, 518 F.3d at 873. Inmate Mckensie has not sought relief from the Court, nor has he presented any statement of the type that would support Plaintiff's allegation.

### E. Retaliation Against Inmate Ramos

Plaintiff claims that within days of the February 2 hearing, Officer Thompson "specifically targeted witness Jimmy Ramos for a pat-down search while stating 'You

---

[5] In the Status Report and Special Notice to the Court, Plaintiff notes that Inmate Fourhorns has now been released from the SHU after 30 days. (Doc. 77 at 2). While Plaintiff claims that Inmate Fourhorns now maintains that he was framed, Inmate Fourhorns admitted the charge in the disciplinary process and was found guilty of possessing a weapon.

like cheese huh,' or words to that effect." (Doc. 64 at 2). Plaintiff lacks standing to pursue a remedy for Inmate Ramos. *See Timpson*, 518 F.3d at 873. Inmate Ramos has not sought relief from the Court, nor has he presented any statement of the type that would support Plaintiff's allegation. Further, a single pat search does not rise to the level of being excessive or unnecessary, nor does it trigger the Court's inherent authority.

### F. Retaliation Against Darnell Nash

Darnell Nash, a transgender female inmate, testified at the February 2 hearing. *See* Doc. 60. Ms. Nash claims that in response to her testimony, she has been subjected to retaliation by BOP staff on multiple occurrences. (Doc. 70). Defendants claim that the events Nash describe are not causally connected to her testimony. *See* Doc. 76 at 12–17.

Ms. Nash is not a party to this lawsuit, but did testify as a witness at the February 2 hearing. This Court has the power to sanction parties for intimidating witnesses to protect its own integrity and to ensure the orderly disposition of a case. *See Harvard v. Inch*, No. 4:19cv212-MW/MAF, 2021 WL 12133089, at *4 (N.D. Fla. Apr. 7, 2021). If Nash can show that BOP staff are retaliating against her for participating in this lawsuit, she may be entitled to protections under this Court's inherent authority.

#### 1. Visual Search

Nash's first allegation of retaliation occurred on February 23, 2026, when she claims male guards forced her to strip naked and took pictures of her breasts. (Doc. 70

16

at 18). The BOP keeps records of all visual searches, and there is no record of Nash receiving a search on that date. *See* Doc. 76 at 12; Doc. 76-1 at 2–3. On February 23, 2026, Nash was interviewed by staff in Psychology in reference to a Prison Rape Elimination Act ("PREA") complaint. *See* Doc. 76 at 12–13; Doc. 74-3 at 11–12. The complaint referenced an alleged April 2024 sexual assault by a guard at a different prison. *See* Doc. 76 at 12.[6] Nash has failed to establish that she was subjected to a visual search on February 23, 2026, in retaliation for her testimony at this Court's February 2 hearing.

### 2. Incident with Cellmate

Next, Nash claims that on February 24, 2026,[7] her cellmate E.T.,[8] "held her at razor point for over an hour, punched her, groped her, and forced her to perform a sexual act on him." (Doc. 70 at 17). After the attack, Nash told three different officers that she needed to be separated from E.T., but no action was taken. *Id*. She claims staff took no action because they wanted revenge against her due to her testifying against Defendants. *Id*.

Prior to this incident, Nash and E.T. had been cellmates for several months without incident. (Doc. 74-5 at 3). That night, Nash stated that E.T. began acting erratically with screaming outbursts as if he were in a state of psychosis, experiencing

---

[6] At the interview, Nash did not mention the alleged retaliatory strip search. Instead, Nash's main concern was "her belief that she should not be in prison due to FSA eligibility." (Doc. 74-3 at 11).

[7] BOP records show that Nash alleged this incident occurred on February 25, 2026, between 9:00 p.m. and 10:00 p.m. *See* Doc. 74-5 at 2.

[8] *See* Doc. 76 at 13.

hallucinations, delusions, and disrupted thinking. *Id*. Nash was on the bottom bunk with a blanket covering her during E.T.'s episode. *Id*. E.T. eventually moved the blanket and stood over Nash while holding a razorblade. *Id*. Nash claims that E.T. touched her breast while stating she was "sexually tempting" him, but after she addressed his inappropriate behavior, E.T. began apologizing and then cut himself on the face and hand with the razorblade.[9] *Id*. Nash then pressed the cell duress button and staff arrived shortly after to remove E.T. and placed him on suicide watch. *Id*. On the morning of February 26, 2026, E.T. was cleared by the Psychology Unit to return to the housing unit. *Id*. at 4. When E.T. returned to the cell, Nash told him that he needed to move, or she would put a PREA on him. *Id*. at 4.

Nash submitted a PREA complaint against E.T., and in the morning of February 26, 2026, Special Investigative Services ("SIS") conducted an interview with her regarding her complaint. (Doc. 74-5 at 3). During the interview, Nash stated that she could not be cellmates or live around E.T. due to the behavior he displayed during the incident. *Id*. After SIS interviewed E.T., it determined that the PREA case was unsubstantiated. *Id*. at 6–7. At the conclusion of the investigation, BOP records show that Nash verbalized suicidal ideation and was assessed by Psychology. (Doc. 74-3 at 6). Nash told the psychologist that she did not feel safe in her housing unit due to the incident with E.T. *Id*. at 7. According to Defendants, Nash refused to return to the K-1 Unit so she was transferred to the SHU. (Doc. 76 at 14).

---

[9] E.T. denied touching Nash. *See* Doc. 74-5 at 4, 6.

Contrary to Nash's claims, the BOP investigated both the incident with E.T and her subsequent PREA complaint. Nash has failed to establish that the results of these investigations were influenced by any animus against her due to her testimony at the February 2 hearing.

### 3. Incident with Correctional Officers

Nash claims that in retaliation for testifying against him, the Warden and Associate Warden "ordered a hit on Ms. Nash." (Doc. 70 at 10). Specifically, she claims that Lt. Barry, and five other male officers, attacked her leaving her "unconscious and in a pool of her own blood" due to her testimony at the February 2 hearing. *Id*. at 9–10. She claims that when she was attacked, she "was not only calm, submissive, non-combative, and cooperative … [and] handcuffed [but] safely quarantined in a special housing unit holding cell." *Id*. at 9. Nash alleges that Lt. Barry "struck Ms. Nash in the face and forced her down to the ground and began slamming her head on the concrete floor." *Id*. Nash further claims that Lt. Barry "bit Nash on the face and breast" and taunted her by making statements that the "judge can't protect you now," "I know what you said in court," and "Carlton and Barber says [sic] hi." *Id*. at 9, 11. Nash was then transported to a non-prison hospital, and she received five staples for her head wound. *Id.*

In response to Nash's claims, Defendants state that this incident was not related to Nash's testimony but due to Nash's noncompliance and disruptive behavior. *See* Doc. 74-6; Doc. 76 at 14. On February 26, 2026, after Nash was transferred to the SHU, she was being placed in a holding cell at around 6:10 p.m. (Doc. 74-6 at 3). The

BOP's incident report states that after being placed in a holding cell, Nash refused to relinquish the hand restraints, pulled away from the escorting staff, and aggressively turned toward the staff. *Id*. Lt. Barry used "the amount of force necessary to regain control" and placed Nash on the floor. *See* Doc. 74-6 at 3, 5, 6; Doc. 76-2 at 1–2. During the fall, Nash's head hit a bolt in the cell, causing a one-centimeter laceration above her right eyebrow. *See* Doc. 74-7 at 51; 76-2 at 2.[10] Other staff members assisted in regaining control of Nash's extremities. (Doc. 74-6 at 8, 13–16). Lt. Barry denies biting Nash during the incident and denies having any knowledge of Nash's participation at the February 2 hearing. (Doc. 76-2 at 1–2).

The videos submitted by Defendants support their claims. The video showing the takedown supports the claim that the use of force was due to Nash's noncompliance in allowing the guard to remove her handcuffs. It appears that when performing the takedown maneuver, the guard lost his balance and fell to the ground with Nash and landed on top of her. In the melee, Nash hit her head on an exposed bolt during the fall, causing a laceration above her eyebrow. While the video does show Nash was bleeding profusely from her injury, she was not unconscious and was not "left there." Officers remained with her throughout the incident, and they filmed the incident with the stationary cameras in the facility and a separate handheld camera. After Nash was removed from the holding cell and was being secured on the ground, BOP staff retrieved a towel to wipe the blood off Nash's face and placed it under her

---

[10] On February 27, 2026, Barber inspected the holding cell and found a bolt that "slightly protrudes in the back of the cage, below waist level." (Doc. 76-1 at 3).

head as padding while they secured her with restraints. The BOP staff also used a shield to protect the officers while applying restraints and while escorting Nash back to the SHU without incident. The bleeding had subsided within a few minutes, and Nash was taken for a medical observation and then transported to a hospital for further treatment.

Additionally, the camera showed Barry's face right after Nash was secured, and there was no blood on his face, refuting Nash's claim that the laceration on her face was caused by a bite from Barry. The medical records from the hospital also tend to refute some of Nash's claims about the incident. While Nash claims that Barry also bit her on the breast, the examining nurse found "no obvious abrasion laceration" to Nash's left breast. (Doc. 74-7 at 52).

Even if there were some causal connection between Nash's testimony at the February 2 hearing and Barry's intent to use force, which the evidence does not support, this causal connection would have been broken because the adverse action suffered by Nash was a direct result of her noncompliance in failing to allow Barry to remove her hand restraints without resistance. *See Nieves v. Bartlett*, 587 U.S. 391, 398 (2019); *Smith v. Mosley*, 532 F.3d 1270, 1279 (11th Cir. 2008) (finding that if a prisoner would have been subject to the same discipline in the absence of protected speech, the retaliation claim will fail). Nash has failed to establish that Lt. Barry's takedown was in retaliation for her hearing testimony.

21

#### 4. Denial of First Step Act Time Credits

Nash claims also that the Warden denied the application of her First Step Act time credits toward early release due to her testimony at the February 2 hearing. (Doc. 70 at 19–20). She alleges that she was eligible for and had previously been granted the time credits, but after the hearing the Warden denied the application. *Id*. In response, the Defendants note that the Warden denied Nash's time credits claim in October 2025, months before the February 2, 2026, hearing. (Doc. 76 at 16–17); (Doc. 74-8 at 7–8). The denial was based on Nash's failure to "demonstrate[ ] a good faith effort to lower [her] recidivism risk as outlined in PS5410.01, section 10, due to [her] lack of FSA programming, the history of Prohibited Acts, and the High Recidivism score…" (Doc. 74-8 at 8). Nash has failed to establish any retaliation related to the hearing regarding the denial of her time credits. Any challenge by her to loss of time credits must be pursued through standard channels.

Nash further claims that the PREA coordinator initially agreed to reverse the Warden's "retaliatory denial of Nash's earned federal time credits, but after Nash testified" at the February 2 hearing, "the PREA coordinator reversed its prior position" saying he had "changed his mind" because Nash "snitched on the warden." (Doc. 81 at 2). As noted above, the Warden's decision was made in October 2025. *See* Doc. 74-8 at 7–8. In a separate lawsuit, docketed on November 12, 2025, Nash complained that the PREA coordinator was not supporting her request for FSA release:

> The PREA coordinator was required to protect Ms. Nash from the erroneous deprivation of earned FSA credits due to rape and retaliation when she reported the abuse. Yet the PREA coordinator refuse to do so, citing [President Trump's Executive Order].

*See Nash v. Trump, et al.*, Case No. 5:25-cv-717-AGM-PRL, Doc. 1 at 14. Therefore, Nash has admitted in a judicial proceeding that the PREA coordinator's decision to not support Nash's FSA claim had occurred prior to and was unrelated to the February 2 hearing. Consequently, that issue falls outside the purview of any authority the Court has under Fed. R. Civ. P. Rule 26 to protect the integrity of its proceedings and to shield witnesses from retaliation for responding to the Court's directive to give testimony.

## CONCLUSION

Accordingly, it is **ORDERED** and **ADJUDGED** as follows:

1. Plaintiff's Emergency Motion for a Protective Order and for Further Appropriate Relief (Doc. 64) is **DENIED**.

2. Plaintiff's Motion to Reopen this Case and for a Hearing on Plaintiff's Second Emergency Motion for a T.R.O. & Preliminary Injunction (Doc. 65) is **DENIED**.

3. Darnell Nash's Emergency Motions for Injunction Order Protection for Prisoner Witnesses (Docs. 70 and 72) and Emergency Motion for Protective Order (Doc. 81) are **DENIED**.

4. Within 14 days of this Order, the BOP must provide a declaration from the R&D staff member or members responsible for searching Plaintiff's legal folder, show cause as to why Plaintiff's materials were confiscated, whether they have the materials in the possession, and if so, why they should not be returned to Plaintiff. Alternatively, the BOP may advise that any materials that were reviewed either were not seized or have since been returned.

**DONE** and **ORDERED** in Tampa, Florida on May 28, 2026.

_____
MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

Copies to: Pro Se Plaintiff; Counsel of Record; Darnell Nash